[Cite as *State v. Schaaf*, 2023-Ohio-4009.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

State of Ohio                                    Court of Appeals No.  WD-22-045

     Appellee                               Trial Court No.  2020CR0479

v.

Michael R. Schaaf                            **DECISION AND JUDGMENT**

     Appellant                              Decided:  November 3, 2023

* * * * *

Paul A. Dobson, Wood County Prosecuting Attorney, and
David T. Harold, Chief Assistant Prosecuting Attorney, for appellee.

Lawrence A. Gold, for appellant.

* * * * *

**ZMUDA, J.**

## I.  Introduction

{¶ 1} Appellant, Michael Schaaf, appeals the June 14, 2022 judgment of the Wood County Court of Common Pleas convicting him of attempted murder and breaking and entering.  For the following reasons, we affirm the trial court's judgment.

## A. Procedural Background

{¶ 2} On October 22, 2020, appellant was indicted on one count of attempted murder in violation of R.C. 2923.02(B) and (D), a first-degree felony; two counts of aggravated arson in violation of R.C. 2909.02(A)(1) and (B)(2), each a first-degree felony; one count of aggravated arson in violation of R.C. 2909.02(A)(2) and (B)(3), a second-degree felony; and one count of breaking and entering in violation of R.C. 2911.13(B) and (C), a fifth-degree felony. The charges arose from the investigation of a fire that occurred on July 8, 2020. Appellant appeared for his arraignment on November 2, 2020, and entered a not guilty plea to all of the charges.[1] Following a competency hearing in which appellant was deemed competent to stand trial and extended plea negotiations, the matter proceeded to a four-day jury trial beginning on April 26, 2022. During trial, the parties elicited the following testimony and evidence relevant to this appeal:[2]

---

[1] Appellant was charged with an additional count of felonious assault through a separate indictment that was joined with the present case, pursuant to Crim.R. 8 and 13, through the trial court's December 10, 2020 order. That additional count was dismissed during appellant's trial and is not part of this appeal.

[2] Both at trial and in this appeal, appellant only argued that the state had not shown that he was the perpetrator of the arson. He does not challenge whether the fire was the result of arson. Therefore, testimony unrelated to appellant's identity as the perpetrator has been omitted.

2.

**Testimony of K. C.**

{¶ 3} K.C. was appellant's wife from 2002 until 2020. She and appellant divorced in February, 2020. The following month, K.C. applied for, and was granted, a protection order prohibiting appellant from contacting her and her children. Immediately following their divorce, K.C. and her children remained in the marital residence. While there, she observed appellant driving past the residence in his truck "on a regular basis." She and her children ultimately left the marital residence and they began staying with K.C.'s parents in Wood County, Ohio in May, 2020, before finally moving into a nearby residence.

{¶ 4} On July 8, 2020, K.C. received a phone call from her father, F.C., "sometime between 2:00 and 3:00" a.m., informing her that his house was on fire. He asked K.C. to come and assist with getting her mother, J.C., to safety. During her testimony, the state presented K.C. with a photograph of a lighter identified as State's Exhibit 2C. She testified that she had never seen or used the lighter before.

{¶ 5} Additionally, she testified that while the couple was living in Alabama in 2018, appellant was involved in a motorcycle accident. As a result of that accident, appellant suffered a traumatic brain injury and a back injury. Due to appellant's ongoing back pain resulting from the accident, he began to shift side-to-side when walking, a gait she described as a "swagger."

{¶ 6} On cross-examination, K.C. testified that at the time of the fire, appellant owned a yellow motorcycle. She was not, however, aware of the precise location of the

3.

motorcycle at the time of the fire and its aftermath. Lastly, K.C. stated that she believed appellant only had one cell phone at the time the fire occurred.

**Testimony of F.C.**

{¶ 7} F.C. is K.C.'s father and appellant's former father-in-law. He and J.C. lived at a residence on Newton Road, Bowling Green, Wood County, Ohio from the mid-1970s up to and including the date of trial. He testified that the fire that occurred on July 8, 2020 originated at the rear of the residence. He awoke that night to fire alarms some time between 2:00 a.m. and 2:30 a.m. He immediately woke J.C., told her to get dressed, and then went to determine the location of the fire. He proceeded through the residence toward the garage. He initially believed that the fire began in the garage due to the amount of smoke in that location.

{¶ 8} Upon confirming that there was a fire, he called 911 to request assistance. Then, seeing that the fire was only burning on one side of the garage, he pulled his vehicle out to a safe distance and had J.C. sit in it while he returned to attempt to extinguish the flames. Upon returning to the residence, he discovered that the main portion of the fire was actually on the exterior of the sunroom at the rear of the residence. He used his experience as a retired firefighter to instruct a neighbor that came to assist to begin removing the siding and soffits from the property so that they could reach the source of the fire underneath. The fire department arrived shortly thereafter and were able to extinguish the fire before it spread to any other part of the house.

4.

{¶ 9} After describing the incident, the state showed F.C. a photograph of a lighter, identified as Exhibit 2C, that was discovered at the scene shortly after the fire was extinguished. F.C. testified that it was not his lighter, that he had never seen the lighter before, and that he did not own any lighters that looked similar.

{¶ 10} On cross-examination, F.C. provided additional details regarding the sequence of events following his discovery of the fire. He also noted that the neighbor that assisted him had driven from approximately one mile away. He confirmed that while he initially believed that the garage was the primary location of the fire that the flames actually originated from the sunroom at the rear of the residence.

{¶ 11} F.C. also testified that prior to the fire he had been involved in several disputes with a neighbor. These disputes included an incident in which F.C.'s mailbox was knocked over and an ongoing dispute over his neighbor's continued mowing of grass over F.C.'s property line. The mailbox incident occurred two days prior to the fire. F.C. testified that the Wood County Sheriff's Department investigated the mailbox incident and concluded that the neighbor had not been involved. F.C. said that he did not recall informing the deputy that responded to the fire on July 8, 2020, that he suspected his neighbor likely started the fire. F.C. again denied owning a lighter similar to the state's Exhibit 2C and denied that he ever burned any refuse in a barrel behind his house. He concluded his testimony by denying that he had started the fire on July 8, 2020.

5.

**Testimony of Deputy Kert Appelhans**

{¶ 12} At the time of trial, Kert Appelhans had been employed as a deputy with the Wood County Sheriff's Department for 23 years. His primary assignment was "road patrol." He testified that on July 8, 2020, he responded in this capacity to a report of smoke in a garage at F.C.'s residence.

{¶ 13} Upon his arrival, he observed smoke both in the garage and the residence. He could also hear smoke alarms ringing. He saw F.C. inside the residence with his wife and went to speak with him. F.C. initially informed Deputy Appelhans that he did not know the precise location of the fire but discovered it at the rear of the house while they talked. After discovering the source of the fire, Deputy Appelhans then went to his vehicle to retrieve a fire extinguisher.

{¶ 14} Deputy Appelhans also testified that he and F.C. had some discussions about the cause of the fire after it had been extinguished. F.C. informed him that there was a gas heater in the sun room but that the pilot light had been turned off for the summer. F.C. also stated that there were no electrical utilities in the wall where the fire was located. F.C. informed Deputy Appelhans that he believed "the fire was suspicious."

{¶ 15} After the fire department arrived and began putting out "hot spots," Deputy Appelhans "chitchatted" with another responding deputy—Deputy Logan Spangenberg. During their conversation, Deputy Spangenberg discovered a lighter in the grass approximately 15 feet from where the fire occurred. After its discovery, Deputy Appelhans remained by the lighter while Deputy Spangenberg went to get a camera and

6.

collect the evidence.  Deputy Appelhans confirmed that state's Exhibit 2 was an accurate picture of the lighter that Deputy Spangenberg discovered.

{¶ 16} On cross-examination, Deputy Appelhans described seeing flames on the sun porch and spreading up through the eaves and soffits of the residence when he arrived. He described it as "a significant fire."  Deputy Appelhans also stated that F.C. indicated his belief that his neighbor's children may have started the fire in response to their ongoing dispute over the mailbox and property line.  F.C. showed Deputy Appelhans a set of stakes that he had placed at the property line to discourage his neighbor from mowing on his property.  Deputy Appelhans and Deputy Spangenberg later searched appellant's property but did not find any additional evidence related to the fire.

{¶ 17} Deputy Appelhans testified that K.C. eventually arrived at the scene and told him that she believed appellant was responsible for the fire.  She based her belief on the fact that she had a protection order against appellant and because appellant had allegedly threatened her with a firearm.  Appelhans testified that F.C., after speaking with K.C., also expressed his opinion that appellant could have started the fire.

### Testimony of Deputy Logan Spangenberg

{¶ 18} Deputy Logan Spangenberg had been employed as a deputy for the Wood County Sheriff's Department for approximately three years at the time of trial.  He was generally assigned to road patrol where his primary duties consisted of responding to

7.

calls for service. He was working in that capacity when he responded to a report of "fire or smoke" at F.C.'s residence on July 8, 2020.

{¶ 19} When he arrived, he observed smoke coming from the residence and Deputy Appelhans running to his vehicle to obtain a fire extinguisher. He inquired whether another fire extinguisher was necessary but Deputy Appelhans declined that offer, stating that the responding fire department was close to arriving. Deputy Spangenberg then entered the residence and escorted J.C. outside. He described the smoke in the portion of the residence he entered as "a fair amount."

{¶ 20} After the fire department arrived, Deputy Spangenberg stood to the side and began discussing the emergency call with Deputy Appelhans. During that conversation, he saw a lighter on the ground a few feet in front of them. The lighter was "15 to 20 feet" from the residence. He then contacted Detective Lieutenant Rod Smith of the Wood County Sheriff's Department who advised Deputy Spangenberg to photograph the lighter and place it in an evidence bag. Deputy Spangenberg confirmed that he took the photographs introduced as state's Exhibits 2A, 2B, and 2C and that they were true and accurate depictions of the lighter on July 8. 2020. After securing the lighter in an evidence bag, Deputy Spangenberg locked the bag in his vehicle. He testified that no one else had access to the vehicle at any time. After the incident concluded, he returned to the Wood County Sheriff's Office and placed the bag in an evidence locker.

8.

**{¶ 21}** On cross-examination, Deputy Spangenberg denied ever touching or kicking the lighter before it was collected. He did not recall ever testing the lighter to see if it worked when it was in his possession.

**Testimony of Deputy Jeremy Holland**

**{¶ 22}** Deputy Jeremy Holland was in his 17th year of employment with the Wood County Sheriff's Department at the time he testified at appellant's trial. His general duties during that time included, as relevant to this appeal, supervision of the department's evidence room.

**{¶ 23}** He described the process of logging in evidence as beginning when an officer brings evidence from the scene of a crime, places it in an evidence locker, and then deposits the key to that locker in a drop box. When he arrives the next morning—if the evidence is collected overnight as it was in the present case—he will obtain the key from the drop box and open the evidence locker from inside the evidence room. The evidence is then assigned a bin number and logged as being received in the evidence room at that time. This is the same procedure that he performed to log the evidence bag collected from the scene of the fire on July 8, 2020.

**{¶ 24}** After describing this process, the state presented Deputy Holland with its Exhibit 19. He identified the exhibit as an "evidence envelope" that is used to identify the evidence contained therein and the circumstances under which it was collected. Deputy Holland also described an additional blue label placed on the envelope. He described this as a "BCI submission" label showing that the evidence was submitted to

9.

the Ohio Bureau of Criminal Investigation. He then stated that State Exhibit 19 was an evidence envelope containing a blue lighter. He also identified the contents of another evidence envelope—State Exhibit 22—as appellant's cell phone that was collected at the Wood County Justice Center on October 29, 2020.

{¶ 25} The state next presented Deputy Holland with its Exhibits 9A, 9B, and 9C. He identified the cumulative exhibit as a "BCI submission sheet" that he used to submit the lighter, appellant's phone, and DNA samples from appellant[3] and F.C. to the BCI for testing. He testified that F.C.'s DNA was submitted "for elimination." The submission sheet reflected that the evidence was with the BCI from July 9, 2020, until August 12, 2020. He testified that the evidence had been in the evidence room from that date until he retrieved it for purposes of trial in this case.

{¶ 26} Appellant did not cross-examine Deputy Holland.

### Testimony of Lindsay Deetz

{¶ 27} Lindsay Deetz is a forensic scientist at the BCI crime laboratory in Richfield, Ohio. She described herself as a specialist in the DNA section of the lab and that she had analyzed DNA "thousands of times." She was qualified as an expert witness in DNA analysis without objection from appellant.

---

[3] The inclusion of appellant's DNA sample was described through the subsequent witness testimony of Lindsay Deetz. Because appellant's appeal does not challenge the submission of his DNA to the BCI, we include its submission to the BCI here for purposes of clarity only.

10.

{¶ 28} After providing a basic overview of how DNA identification works and how she performs her analysis, Deetz provided specific details regarding her testing of the evidence in the present case. She identified State Exhibit 19 as the blue lighter she was asked to test in relation to the BCI case number associated with the July 8, 2020 incident. She testified that her analysis resulted in the collection of two DNA samples from the lighter. Of these two samples, only one—identified as the "major contributor"—was in an amount sufficient for her to compare to a known sample for purposes of identification. Her analysis concluded that F.C. was not the major contributor of the DNA discovered on the lighter. Her analysis also found that appellant was the major contributor of the DNA discovered on the lighter. She also testified that with each analysis they establish the statistical rarity of the DNA profile being tested. She testified that the DNA profile matching appellant was rarer than one in one trillion individuals. From this, she concluded to a reasonable degree of scientific certainty that appellant's DNA "was included in the DNA that was found on the lighter."

{¶ 29} During appellant's cross-examination, Deetz stated that she swabbed the entire "handle" portion of the lighter to collect the DNA sample. She testified that although she identified appellant's DNA, she could not explain how his DNA was placed on the lighter. She testified that if an item is stored under certain conditions that the DNA can remain on the item "indefinitely." She also described the laboratory precautions she takes to ensure that DNA samples are not contaminated with other DNA samples during her testing. Deetz also acknowledged that while she could not identify

11.

F.C. as the major contributor of DNA found on the evidence that she could not conclude that his DNA was not part of the unidentifiable DNA found on the lighter.

## Testimony of Susan Hubbell

{¶ 30} Susan Hubbell is a neighbor of F.C. She testified that on July 11, 2020, she heard a loud motorcycle outside her residence as she was getting ready for bed. She looked out her window and saw a motorcyclist park his motorcycle in from of F.C.'s house. The individual then began walking up F.C.'s driveway. Hubbell observed the individual walk around the back of F.C.'s residence and then turn around and walk back to the motorcycle. She could not see the individual's face but observed that he walked "like [he] was drunk or something." She described his gait as "left-right, left-right" and that it "wasn't just a normal gait of a person."

{¶ 31} On cross-examination, she stated that she observed the individual from approximately 100 to 150 feet away. She could not provide any specific details regarding the individual beyond his gait and that the motorcycle he drove was louder than others she had previously heard.

## Testimony of Detective Lieutenant Rod Smith

{¶ 32} At the time of trial, Rod Smith had served as Detective Lieutenant with the Wood County Sheriff's Department for three years. As part of his work, he received training specific to interviewing witnesses, victims, and those suspected of committing crimes. In that training, he was taught to look for discrepancies, movement, and

12.

deflection—changing the subject from the question asked—as indicative of the person being interviewed's reliability.

{¶ 33} On the night of July 8, 2020, Detective Smith was serving as the on-call detective to assist with investigations that occurred "after hours." He was contacted by a deputy at the scene of the fire at approximately 3:00 a.m. He instructed the deputy "that there were things to look for" at the scene and was informed that the deputy had already discovered the lighter—an item the deputy believed was suspicious. Detective Smith requested that the deputy take photographs of the lighter and then collect the lighter and place it in an evidence bag.

{¶ 34} Detective Smith did not report to the scene until the following morning, when he met with Frank Reitmeier, an investigator from the State Fire Marshall's office. Mr. Reitmeier informed Detective Smith that F.C. suspected that appellant started the fire. In light of this suggestion, Detective Smith prepared and sent a preservation letter to Verizon to ask them to preserve all of appellant's phone records in their possession. He then sought, and received, a search warrant for the phone records, which he also delivered to Verizon. He also obtained a search warrant permitting him to seize appellant's phone. That warrant was ultimately served following appellant's arrest.

{¶ 35} Contemporaneous with his investigation of appellant, Detective Smith also investigated F.C.'s neighbor. F.C. informed Detective Smith of the incident with his mailbox and that he had observed his neighbor fixing his vehicle the following day. After speaking with the neighbor, Detective Smith concluded that there was no damage to

13.

the vehicle consistent with running over the mailbox and since that was F.C.'s only bases to suspect the neighbor may have started the fire, he did not consider the neighbor as a suspect. He also testified that he eliminated F.C.'s family members as suspects but was not asked to explain the basis for that decision.

{¶ 36} Detective Smith and Mr. Reitmeier interviewed appellant on September 17, 2020. During that interview, Detective Smith learned that appellant had not been a guest at F.C.'s residence at any time in 2020. Appellant denied that he had driven by F.C.'s residence at any time in 2020. When asked about whether he owned a grill and how he lit it, appellant "distanced himself" from using the word "lighter" before ultimately conceding that he owned a "grill lighter." Appellant then told Detective Smith that the lighter with his DNA on it could only have been placed there by his soon-to-be ex-wife, K.C.

{¶ 37} After appellant was arrested, his cell phone was collected pursuant to the search warrant and a deputy in the Wood County Sheriff's Department was tasked with copying the data from the phone. The cell phone data showed, based on the location of cell phone towers picking up its signal, that appellant's phone was traveling north on Interstate 75 between 11:00 p.m. on July 7, 2020, and 1:00 a.m. on July 8, 2020 towards Toledo, Ohio. The signal indicated that the phone traveled north of Toledo to the border between Ohio and Michigan. The phone's signal was next received by a cell phone tower at 2:00 a.m. just north of Findlay, Ohio. At 10:45 a.m., text messages were sent from appellant's phone to appellant's sister and brother-in-law, respectively, asking if it was ok

14.

for him to come to their residence in Indiana. Detective Smith testified that appellant's use of the phrase that he needed to "leave Ohio" in suggesting a visit was suspicious based on his training.

{¶ 38} Detective Smith next discussed the search history recovered from appellant's cell phone. He noted that appellant's search history included "approximately a dozen internet searches on arson, on evidence during arson, on DNA, and evidence for arson cases." He also found an additional search seeking information on where "firemen start fires."

{¶ 39} Referencing Ms. Hubbell's report of a motorcycle parked in front of F.C.'s residence on July 11, 2020, Detective Smith testified that he asked appellant about that incident during the interview. Appellant denied having driven his motorcycle to F.C.'s house. He continued his denial after Detective Smith informed him that a neighbor reported "someone matching [appellant's] description" at the residence that evening.

{¶ 40} On cross-examination, Detective Smith noted that the internet searches on appellant's phone took place on September 17, 2020, after the interview in which Detective Smith described the course of his investigation. He also acknowledged that none of the searches were conducted prior to the July 8, 2020 fire. As to Ms. Hubbell's report, Detective Smith testified that appellant described owning two motorcycles at the time of the fire. In addition to denying that he drove his motorcycle to F.C.'s residence, appellant also told Detective Smith that he was "unable to drive a motorcycle that far."

15.

{¶ 41} Appellant's counsel then asked Detective Smith about the scope of his investigation. Detective Smith testified that when he spoke with a neighbor the day after the fire, that the neighbor advised him that F.C. had trail cameras installed prior to the fire. He did not follow-up with F.C. to obtain any video captured by those cameras and, on redirect examination, Detective Smith explained that he believed the trail cameras were actually installed later on July 8, 2020, at his suggestion, because K.C. expressed concern about leaving the property unoccupied while her parents awaited repairs from the fire. As a result, he concluded that they were not in place at the time of the fire and would not have recorded the incident.

{¶ 42} Detective Smith next reviewed the affidavit he executed in support of the search warrants. He conceded that the affidavit did not identify arson investigation as part of his experience. He also stated that his last training in arson investigation was approximately 10 years before appellant's trial. He also affirmed that his affidavit stated that F.C. identified appellant as the only suspect despite F.C. having also mentioned his dispute with one of his neighbors. Detective Smith also recalled that he received an email from appellant following their September 17, 2020, claiming that appellant was at his sister's house in Indiana on July 8, 2020. Detective Smith later testified that appellant's sister denied that appellant was with her on the date of the fire. Lastly, Detective Smith testified that he had received a copy of a cell phone tower mapping

16.

report from appellant's expert witness—Anthony Milone—and that he agreed with the conclusions in the report.[4]

### Testimony of Frank Reitmeier

{¶ 43} Frank Reitmeier testified that he had served as an investigator with the Ohio Fire Marshall's Office for 16 years prior to appellant's trial. He was called to the location of the fire on July 9, 2020, to assist in the arson investigation. During that investigation, Mr. Reitmeier smelled gasoline in an area behind F.C.'s residence. Following laboratory testing of debris collected from the area that confirmed the presence of gasoline,[5] Reitmeier concluded that the fire was set intentionally with gasoline used as an accelerant. He further testified, however, that it was impossible to determine whether the fire was started by the lighter that was discovered at the scene.

{¶ 44} Reitmeier also described his assistance with the investigation that determined appellant had started the fire. He testified that he initially considered multiple individuals as suspects including F.C., K.C., F.C.'s neighbor, and appellant. All suspects other than appellant were eliminated by the Wood County Sheriff's Department through the course of its investigation. Reitmeier agreed with those conclusions. He also testified that it was common in the course of his investigations to learn that the perpetrator of the

---

[4] Appellant's counsel did not introduce Milone's report or specify any of his conclusion during Detective Smith's testimony.

[5] The state had previously elicited testimony from Christa Rajendram, a laboratory support chemist with the State Fire Marshall's Forensic Lab, confirming the presence of gasoline in debris collected from the area in which the fire originated.

arson would return to the scene of the fire. He stated that this was included in his training and that the offenders would return for various reasons including to see the damage done or to discern why the fire did not cause the damage that they anticipated.

{¶ 45} Reitmeier was present at Detective Smith's interview with appellant on September 17, 2020. He described appellant as cooperative but also that appellant often "deflected" his responses when asked about the fire to discuss he and K.C.'s domestic relations issues. He confirmed that appellant did not object to having a DNA sample taken at the time of the interview. Reitmeier testified that he asked appellant directly if he had started the fire and appellant responded that "he did not." Appellant also denied hiring anyone to start the fire.

### The State Rests and Appellant's Crim.R. 29 Motion for Acquittal

{¶ 46} At the conclusion of Reitmeier's testimony, the state rested its case-in-chief. The state them moved for each of its exhibits to be admitted into evidence. The trial court admitted the state's exhibits into evidence over appellant's objections.

{¶ 47} Appellant then made his motion for acquittal pursuant to Crim.R. 29. Appellant argued that there was no evidence that he was in the area of the fire on July 8, 2020, and no evidence that the lighter discovered in the course of the investigation was used to start the fire. In response, the state argued that the presence of the lighter containing appellant's DNA, in conjunction with "all the evidence that was presented to the court" regarding the arson itself, was sufficient to support charged offenses when viewed in a light most favorable to the state. The trial court denied appellant's motion.

18.

**{¶ 48}** Appellant then proceeded with his case-in-chief in which the following testimony was elicited:

### Testimony of Gail Ambrose

**{¶ 49}** Gail Ambrose testified that she is appellant's sister. At the time of trial, she lived in Kokomo, Indiana, and had done so for the previous 30 years. She testified that injuries from a 2018 motorcycle accident affected appellant's sleep patterns and his ability to express his thoughts articulately. He also had difficulty staying on topic during conversations.

**{¶ 50}** Ambrose recalled receiving a text from appellant on July 8, 2020. In his text, appellant asked if he could come to her home in Indiana to work on documents for his pending domestic relations dispute with K.C. She testified that appellant had already asked two days prior about coming to her home and she understood this text as a clarification of when he would make the trip. She told him that he was welcome that day and he arrived between 3:00 and 4:00 that afternoon. She testified that he spent time preparing for an upcoming hearing in his domestic relations proceeding with K.C. and that he left to return to Ohio the following day.

**{¶ 51}** On cross-examination, Ambrose confirmed that appellant was not at her house at 2:30 in the morning on July 8, 2020. She acknowledged that appellant had previously stated that he was at her residence at that time but she attributed that mistake to memory issues and confusion arising from his motorcycle accident. The state next asked Ambrose why the text messages appellant sent about coming to her residence two

19.

days prior to the fire were not recovered from his phone. She stated that the data recovered conflicts with her recollection and that appellant did indeed contact her about coming to Indiana prior to the fire. She did not recall appellant's text message on July 8, 2020, saying the he needed to "leave Ohio" but stated that she would not dispute that he used that terminology if it was reflected in the data recovered from his phone.

**Testimony of Anthony Milone**

{¶ 52} Anthony Milone is a cell phone tower data analyst with Speckin Forensics in Fort Lauderdale, Florida. He described his duties as taking cell phone data recovered from a cell phone and preparing a map of the phone's location based on "interactions the phone is making with cell towers[.]"

{¶ 53} Milone testified that he had the opportunity to review appellant's cell phone data after it was recovered by the Wood County Sheriff's Department. He focused his review of the data on appellant's cell phone interactions with cell towers between 8:00 p.m. on July 7, 2020, and 11:30 a.m. on July 8, 2020. His review of the data revealed appellant's sent and received text messages, phone calls, and internet activity in that timeframe. He was also able to identify the location of the towers that interacted with appellant's phone during that time period.

{¶ 54} Milone testified that appellant's phone was stationary from 8:00 p.m. until 10:00 p.m. on July 7, 2020. The phone then interacted with towers moving northward from Findlay, Ohio, until it interacted with a tower in Toledo, Ohio, at 1:00 a.m. on July

20.

8, 2020. The phone then began moving southward until it interacted with a tower in Findlay, Ohio at 2:06 a.m. It remained in Findlay until 11:30 a.m.

{¶ 55} Milone prepared a report reflecting his findings as to the location of appellant's cell phone during the relevant time period. He concluded that because the phone was interacting with a cell tower in Findlay, Ohio, from 2:06 a.m. until 11:30 a.m., that the phone was located in Findlay, Ohio, during that time. He ultimately concluded that appellant's phone was not in the "Bowling Green area around 2:00, 2:30, [or] 2:42 a.m." on the morning of July 8, 2020.

{¶ 56} On cross-examination, Milone agreed that there were different types of signals emanating from a cell phone interacting with a tower based on whether the phone was transmitting phone calls, text messages, or using internet services. The signal he used to connect appellant's cell phone to the cell tower in Findlay, Ohio was an internet service signal that can run in the background while the phone is inactive, that is, not transmitting text messages or phone calls. He testified that the portion of his report finding that the cell phone was interacting with cell towers in Findlay, Ohio was based only on the phone's internet signal and that he was unaware of any text messages or phone calls being transmitted between 2:06 a.m. and 11:30 a.m. on July 8, 2020. He conceded that he could not conclude that appellant was not in the area of the fire at the time it occurred, only that his phone was not in the area.

21.

## Appellant Rests, Renewed Crim.R. 29 Motion for Aquittal

{¶ 57} Appellant rested his case-in-chief at the conclusion of Milone's testimony. After the admission of his exhibits, appellant renewed his Crim.R. 29 motion. He argued that Milone's report indicating that appellant's phone was traveling southward at the time the fire started, in addition to the alleged lack of identity evidence in the state's case-in-chief, warranted an acquittal based on the state's failure to introduce sufficient evidence to show that he committed the charged offenses. The state responded that appellant's phone not being at the scene of the fire did not indicate that appellant himself was not present and requested the trial court deny the motion. The trial court denied appellant's motion and the parties proceeded with closing arguments.

## Jury Deliberation, Verdict, and Sentencing

{¶ 58} Following closing arguments, the trial court provided the jury with its instructions and the jury retired to deliberate. The jury ultimately returned a guilty verdict on all counts.

{¶ 59} The trial court conducted a sentencing hearing on June 10, 2022. The trial court determined that counts 1—attempted murder—and counts 2, 3, and 4—aggravated arson—all merged for purposes of sentencing. The parties agreed that count 5—breaking an entering—did not merge with any other counts.

{¶ 60} The state elected to have appellant sentenced on count 1 of the merged offenses and the trial court imposed an indefinite prison term of a minimum of 7 years and a maximum of 10.5 years pursuant to R.C. 2967.271. The trial court also imposed a

sentence of 12 months in prison on count 5. The trial court's judgment was memorialized in a judgment entry dated June 14, 2022.

## B. Assignment of Error

{¶ 61} Appellant timely appealed and asserts the following errors for our review:

1. The trial court erred in denying appellant's Crim.R. 29 Motion; and

2. The jury's verdict was against the manifest weight of the evidence presented at trial.

## II. Law and Analysis

## A. The trial court did not err in denying appellant's Crim.R. 29 motion.

{¶ 62} In his first assignment or error, appellant argues that the trial court erred when it denied his Crim.R. 29 motion for acquittal. Both at trial and on appeal, appellant does not dispute that someone intentionally started the fire on July 8, 2020, or that that individual's conduct would satisfy the elements of the charged offenses. Instead, he argues that the state failed to introduce sufficient evidence that he was the individual that started the fire. He notes that there was no eyewitness testimony placing him at the scene of the fire on July 8, 2020. Further, he argues that the cell tower data recovered from his phone did not place him at the scene of the fire. As a result, he claims that the state did not introduce sufficient evidence that he was the individual that committed the offenses. We disagree.

{¶ 63} "The standard of review for a denial of a Crim.R. 29 motion is the same as the standard of review for sufficiency of the evidence." *State v. Johnson,* 6th Dist. Wood

23.

Nos. WD-13-008, WD-13-009, 2014-Ohio-2435, ¶ 11. In reviewing a challenge to the sufficiency of the evidence, we view the evidence in a light most favorable to the prosecution and determine whether "any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). In making that determination, we do not weigh the evidence or assess the credibility of the witnesses. *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 132. Whether there is sufficient evidence to support a conviction is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

{¶ 64} It is undisputed that "[e]very criminal prosecution requires proof that the person accused of the crime is the person who committed the crime." *State v. Tate,* 140 Ohio St.3d 442, 2014-Ohio-3667, 19 N.E.3d 888, ¶ 15. "This truism is reflected in the state's constitutional burden to prove the guilt of 'the accused' beyond a reasonable doubt." *Id.,* citing *In re. Winship,* 397 U.S. 358, 90 S.Ct. 1068 (1970). "Like any fact, the state can prove the identity of the accused by 'circumstantial or direct' evidence." *Id.,* citing *State v. Jenks,* 61 Ohio St.3d 259, 272-273, 574 N.E.2d 492 (1991). We find that the state presented sufficient evidence at trial to show that appellant committed the charged offenses.

{¶ 65} The record shows that immediately after the fire was extinguished, a lighter was discovered approximately 15 feet from the fire's origin. That lighter was collected and subjected to laboratory testing by the Ohio BCI. Lindsay Deetz, the forensic scientist

24.

that conducted that testing confirmed that appellant was the primary contributor of the DNA found on the lighter. She testified that the likelihood of any other individual having the same DNA profile as appellant was less than one in one trillion. Additionally, K.C. and F.C. testified that the lighter did not belong to either of them. Finally, K.C. testified that she and appellant were involved in contentious domestic relations proceedings and that she believed he was angry with her.

{¶ 66} Appellant argues that this testimony and evidence is insufficient because there was no eyewitness testimony placing him at the scene of the fire. We reject appellant's argument that the state was obligated to present any corroborating testimony to find that the evidence it did introduce was sufficient. When analyzing sufficiency of the evidence, we address the evidence that the state presented. *State v. Herrera,* 2022-Ohio-4769, 204 N.E.3d 1096, ¶ 33 (6th Dist.). The absence of a specific type of evidence does not negate the sufficiency of the evidence that the state did present. *Id.* Further, whether the evidence the state did introduce could be corroborated or disputed by additional evidence goes to the weight of that evidence, not the sufficiency. *State v. Faulkner,* 6th Dist. Lucas No. L-22-1108, 2023-Ohio-971, ¶ 27, citing *State v. Halfhill,* 4th Dist. Gallia No. 21CA4, 2022-Ohio-3242, ¶ 28, citing *Cleveland v. Watson,* 8th Dist. Cuyahoga No. 108746, 2020-Ohio-3284, ¶ 37 ("[C]orroboration * * * goes to credibility, which is a matter for manifest weight of the evidence, not sufficiency."); *State v. Greer,* 6th Dist. Lucas No. L-21-1153, 2022-Ohio-3082, ¶ 38 (holding that lack of corroboration for co-defendant's testimony attacked co-defendant's credibility, not the sufficiency of

25.

the state's evidence). Therefore, the lack of any corroborating eyewitness testimony placing appellant at the scene of the fire on July 8, 2020, is irrelevant to our review of appellant's first assignment of error.

{¶ 67} Instead, we review only whether the evidence the state did introduce was sufficient to permit a rational trier of fact to find that appellant was the individual that committed the arson beyond a reasonable doubt. *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). That evidence included the discovery of a lighter containing appellant's DNA found near the location where the fire was intentionally set despite the fact that appellant had not been at the residence on any occasion prior to the fire in 2020, a report of an individual matching appellant's description parking a motorcycle walking to the rear of the residence where the fire occurred a few days after the fire, appellant's attempts to deflect questions related to the arson during his September 17, 2020 interview, and appellant's anger with K.C. over their pending domestic relations case. Viewing that evidence in a light most favorable to the state, we find that the state presented sufficient evidence to show that appellant committed the charged offenses and the trial court did not err in denying his Crim.R. 29 motion for acquittal.

**B. The jury's verdict was not against the manifest weight of the evidence presented at trial.**

{¶ 68} In his second assignment of error, appellant argues that the jury's verdict was against the manifest weight of the evidence presented at trial. Specifically, he argues that "[b]ecause there was no direct identification of appellant by witnesses" that the

26.

state's case was "entirely dependent on circumstantial evidence that forensically linked appellant to the arson." This, he argues, resulted in an erroneous verdict because the Sheriff's Department's investigation was lacking and the jury based its verdict on its sympathy toward F.C. and J.C.

{¶ 69} "When examining whether a conviction was contrary to the manifest weight of the evidence, the appellate court serves as a 'thirteenth juror' to conclude whether the trial court lost its way so significantly as to result in a manifest miscarriage of justice, necessitating that the conviction be overturned." *State v. Butler*, 6th Dist. Lucas No. L-08-1390, 2010-Ohio-178, ¶ 11. We note that questions regarding the "weight and credibility of evidence are primarily for the trier of fact." *State v. Teal*, 2017-Ohio-7202, 95 N.E.3d 1095, ¶ 58 (6th Dist.), citing *State v. Pena,* 6th Dist. Lucas No. L-12-1309, 2014-Ohio-423, ¶ 22. This court's "discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins*, 78 Ohio St.3d at 386, 678 N.E.2d 541, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 70} Essentially, appellant argues that the lack of eyewitnesses to the arson, the Sheriff's Department allegedly insufficient investigation to rule out appellant's neighbor as a suspect, and the cell phone data purportedly showing that he was not in the area at the time of the fire, shows that the jury's verdict was against the manifest weight of the evidence. Having reviewed the record, we find that the jury's verdict was not against the manifest weight of the evidence.

27.

{¶ 71} The only disputed issue at trial was whether appellant committed the arson. The record shows that a lighter containing appellant's DNA was discovered near where the fire started. The morning after the fire, appellant sent a text message to his sister in Indiana stating that he needed to "leave Ohio." Additionally, both Detective Smith and Mr. Reitmeier found that while appellant was cooperative during his September 17, 2020 interview, he "deflected" when he was asked any questions about the arson. The lack of eyewitness testimony does not negate the probative value of this evidence as appellant argues. Further, while undisputed evidence suggests that appellant's cell phone was not in the vicinity of the fire at the time it was started, appellant's own witness testified that this evidence could not show whether appellant himself was or was not in the vicinity of the fire.

{¶ 72} In sum, while appellant has shown that evidence and testimony elicited at trial may have complicated the question for the jury as to whether appellant committed the arson, the record does not show that the jury "lost its way so significantly as to result in a manifest miscarriage of justice" in resolving that question. *See Butler*, 6th Dist. Lucas No. L-08-1390, 2010-Ohio-178, at ¶ 11   Put simply, this is not an exceptional case that warrants reversal of appellant's conviction. For these reasons, we find that the jury's verdict was not against the manifest weight of the evidence and find appellant's second assignment of error not well-taken.

28.

### III. Conclusion

{¶ 73} We find appellant's first and second assignments of error not well-taken. Therefore, we affirm the June 14, 2022 judgment of the Wood County Court of Common Pleas.

{¶ 74} Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Gene A. Zmuda, J.                              _____
                                                              JUDGE
Myron C. Duhart, P.J.

                                               _____
Charles E. Sulek, J.                                          JUDGE
CONCUR.

                                               _____
                                                              JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions. Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.