[Cite as *State v. Greer*, 2022-Ohio-3082.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                    Court of Appeals No.  L-21-1153

        Appellee                          Trial Court No.  CR0202002547

v.

Scottie Greer                                  **DECISION AND JUDGMENT**

        Appellant                         Decided:  September 2, 2022

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

Autumn D. Adams, Assistant Prosecuting Attorney, for appellant.

* * * * *

**OSOWIK, J.**

## I.      Introduction

{¶ 1} Appellant, Scottie Greer, appeals the judgment of the Lucas County Court of

Common Pleas, sentencing him to an indefinite prison term of 32 years to life after a jury

found him guilty of murder, felonious assault, and complicity to commit tampering with evidence. Finding no error in the proceedings below, we affirm.

## A. Facts and Procedural Background

{¶ 2} On November 20, 2020, Alvin Volker was shot and brutally beaten to death at a Stop & Go gas station located on South Avenue in Toledo, Ohio. Following an investigation into the incident, appellant was indicted on November 30, 2020, and charged with one count of murder in violation of R.C. 2903.02(A) and 2929.02, an unspecified felony, one count of murder in violation of R.C. 2903.02(B) and 2929.02, an unspecified felony, one count of felonious assault in violation of R.C. 2903.11(A)(2) and (D), a felony of the second degree, and one count of complicity to commit tampering with evidence in violation of R.C. 2921.12(A)(1) and (B), a felony of the third degree. Firearm specifications under R.C. 2941.145 were also attached to each count except tampering with evidence.

{¶ 3} Appellant appeared before the trial court on December 8, 2020, and entered a plea of not guilty to the aforementioned charges. Thereafter, the matter proceeded through pretrial discovery and motion practice, culminating in a four-day jury trial that began on June 28, 2021. At trial, the state called ten witnesses. Appellant did not testify nor call any witnesses of his own. The following facts were adduced at trial.

{¶ 4} Appellant's girlfriend, Carrie Jensen, testified as to the events that transpired in the moments leading up to, and after, the shooting that took place at the Stop & Go gas

2.

station.[1]  Jensen resided with appellant at 880 Wright Avenue in Toledo, across the street from Volker's residence.

{¶ 5} On the morning of November 20, 2020, appellant and Jensen left their residence in pursuit of purchasing some marijuana.  Appellant was in the passenger seat of Jensen's vehicle, a silver Toyota Corolla.  According to Jensen, she turned onto Spencer Street from South Avenue, and then turned right onto Colburn Street, but had to turn around because a garbage truck was blocking her way.  While entering through the intersection of Spencer Street and Colburn Street, Jensen and appellant saw Volker pass by in his truck heading in the direction of the Stop & Go gas station.

{¶ 6} Jensen explained that she was familiar with Volker, but stated: "I didn't know [Volker] personally, but I know he was terrorizing the neighborhood." Furthermore, Jensen noted that Volker and appellant did not get along well, because appellant refused to sell heroin to Volker.  Given these issues, Jensen told appellant that "he needed to handle that.  Talk to [Volker].  Tell him to leave us alone."

{¶ 7} After Jensen turned around and arrived at the corner of Colburn Street and Spencer Street, appellant exited the vehicle and headed in the direction of the Stop & Go

[1] On direct examination, Jensen acknowledged that she was charged with tampering with evidence in connection with this case.  She ultimately agreed to plead guilty to a reduced charge of obstructing justice in exchange for her testimony in appellant's trial.

3.

gas station. Jensen continued driving in another direction and ultimately drove herself back home.

{¶ 8} While back at her residence, Jensen "had a bad feeling and * * * wanted to go back and see what was happening." Consequently, she made her way back toward the Stop & Go gas station, where she observed Volker lying on the ground. Jensen continued past the gas station to the next street, picked up appellant, purchased some marijuana, and stopped at her daughter's residence at the Byrneport apartments in Toledo. At the time, Jensen "assumed that [appellant] beat [Volker] up badly and that was it."

{¶ 9} Upon arrival at the Byrneport Apartments, appellant handed Jensen a box with clothing in it. Jensen deposited the box into a nearby dumpster because she thought Volker's blood might be on the clothing and she wanted to prevent appellant from getting into any trouble. This exchange was captured on surveillance video, which was admitted at trial and published for the jury. Jensen confirmed that the individuals shown in the surveillance video were herself and appellant.

{¶ 10} Eventually, Jensen and appellant returned home and departed together again. While driving, Jensen noticed that police were following her. The police ultimately initiated a traffic stop, culminating in the arrest of Jensen and appellant.

{¶ 11} At the close of her testimony on direct examination, Jensen was shown a surveillance video of the shooting recovered from the Stop & Go gas station, which was previously authenticated by the store manager, Dakota Dutcher, and admitted into

4.

evidence without objection. In the video, Volker was sitting in his parked truck at a gas pump when the assailant rushed upon him and opened fire into the vehicle. After being shot, Volker fell out of the vehicle and stumbled to the ground. The assailant then stood over Volker and struck him several times before departing.

{¶ 12} After watching the surveillance video at trial, Jensen identified appellant as the assailant depicted in the video, and confirmed that appellant was wearing the same clothing as the assailant when he was with her moments prior to the shooting.

{¶ 13} Following the shooting, detectives working for the Toledo Police Department conducted an investigation, which resulted in the discovery of several pieces of evidence. Sergeant Jason Lenhardt of the Toledo Police Department arrived on scene at approximately 9:30 a.m. and found Volker lying on the ground next to his vehicle, with three individuals standing nearby. Lenhardt secured the scene, attempted to render first aid to Volker, and awaited the arrival of paramedics. Thereafter, Lenhardt conducted an investigation of the area with the help of other detectives. During the investigation, Lenhardt discovered a spent shell casing near the rear of Volker's vehicle, which was later retrieved by the Toledo Police Department's Crime Scene Investigations Unit.

{¶ 14} Detective Kristi Eycke of the Toledo Police Department also testified at trial. When Eycke responded to the Stop & Go gas station on the morning of the shooting, there were several other individuals on the scene. She began her investigation into the shooting by viewing the gas station's video surveillance. According to Eycke,

5.

she noticed that the shooter in the video was wearing what appeared to be blue or purple latex gloves.

{¶ 15} Eycke then proceeded to visually examine the area around which the shooting and subsequent altercation occurred. Ultimately, she found and collected one live nine millimeter cartridge, one spent shell casing, one black pillow case, Volker's clothing, mobile phone, and belongings, and a red mobile phone that was found "off in the distance" and brought to Eycke.

{¶ 16} After leaving the scene of the shooting, Eycke made her way to 1443 Western Avenue, where she participated in the traffic stop at which appellant and Jensen were arrested. Eycke photographed Jensen's silver Toyota Corolla, which was later impounded and transferred to the Toledo Police impound lot.

{¶ 17} As Eycke was participating in the traffic stop, she was informed that Toledo Police had received information that the assailant dropped his clothing in a dumpster as he fled the scene of the shooting. In response, Eycke traveled to the dumpster outside of the Byrneport Apartments. Upon arrival, Eycke found a box believed to contain clothing inside the dumpster. After photographing the box inside the dumpster, Eycke climbed into the dumpster and retrieved the box. She opened the box and discovered black sweatpants, black athletic shorts, and a pair of black boots inside. This clothing matched the clothing worn by the assailant shown in the video surveillance recording of the shooting.

6.

{¶ 18} After departing the Byrneport Apartments, Eycke went to appellant's residence to conduct a search warrant. While inside, Eycke found and retrieved several items of interest, including a jacket, sweatshirt, and sweatpants, all of which were black.

{¶ 19} Finally, Eycke completed her investigation by returning to the Toledo Police impound lot to process Volker's truck and Jensen's Toyota Corolla. Inside the Corolla, Eycke collected the front passenger floor mat, a pair of knit gloves, and a black cloth mask. On redirect examination, Eycke stated that the gloves recovered from the Corolla were inconsistent with the gloves worn by the shooter, as depicted in the surveillance video.

{¶ 20} Following Eycke's testimony, the state called detective Jeffrey Jackson of the Toledo Police Department, who was dispatched to the Stop & Go gas station on the day of the shooting. After viewing the video surveillance evidence, Jackson was notified that officers discovered "some surgical type gloves at three locations outside the primary scene." Jackson visited each of these scenes, where he ultimately photographed and collected the gloves that were found there. One pair of gloves was retrieved from a recycle bin on Colburn Street. Jackson traveled to a nearby residence on Colburn Street and collected home surveillance footage depicting the assailant depositing the gloves into the recycle bin. This surveillance footage was admitted into evidence at trial.

{¶ 21} Next, the state called the deputy coroner who performed the autopsy on Volker, Dr. Thomas Blomquist. According to Blomquist, Volker suffered numerous

7.

injuries, including a gunshot wound to the left arm and "multiple fractures" around the front and right side of the face and neck as a result of blunt force trauma. Blomquist testified that a bullet entered Volker's left arm and "went through the left shoulder and chest, the second intercostal space which is between the second and the third rib on the left, the left lung, the pulmonary artery and aorta which is right next to the heart, the right atrium of the heart, the right lung, then deflected off the right rib." In his report, and again at trial, Blomquist stated his opinion, which he held to a reasonable degree of medical certainty, that Volker died as a result of the gunshot wound to the left arm.

{¶ 22} Sara Devine, a forensic scientist in the DNA section of the Ohio Bureau of Criminal Investigation, testified at trial on behalf of the state. In her role as a forensic scientist, Devine analyzes DNA evidence that is recovered from crime scenes.

{¶ 23} Relevant here, Devine tested numerous pieces of evidence that were submitted to her by the Toledo Police Department, including a pair of surgical gloves, a black mask, a black hat, a black head covering, several articles of appellant's clothing, the nine millimeter cartridge recovered by Eycke, and the DNA samples swabbed from appellant and Volker. Devine prepared a report following her analysis of these items, which was entered into evidence at trial without objection. Ultimately, Devine found no DNA evidence present on the black mask, hat, head covering, or appellant's clothing. She found a mixture of DNA with Volker as the major contributor inside the surgical gloves and a mixture of DNA with Volker and appellant as contributors on the outside of

8.

the surgical gloves. Finally, Devine was unable to retrieve any DNA evidence from the nine millimeter cartridge.

{¶ 24} As its final law enforcement witness, the state called detective Paul Marchyok of the Toledo Police Department. Marchyok responded to the Stop & Go gas station approximately 15 minutes after he was notified of the shooting. During his testimony, Marchyok indicated that he interviewed Jensen and appellant after their arrest. At that time, appellant admitted to Marchyok that there was an ongoing feud between him and Volker, but insisted that he was "never at South and Spencer" on the day of the shooting.

{¶ 25} In addition to Jensen's testimony and the testimony of the aforementioned law enforcement officers, the state presented testimony of several eyewitnesses. For her part, Dutcher stated that she heard the sound of a gunshot outside of the Stop & Go gas station, prompting her to look in the direction of the gunshot. Dutcher saw Volker "laying on his back flat on the ground and there was a heavier set taller guy, African American standing over him beating him in the head with a gun." Thereafter, Dutcher watched the assailant as he fled the scene. She then approached Volker, whom Dutcher recognized as frequent patron of the gas station. Dutcher noticed that there was "blood everywhere" and she testified that Volker was unresponsive.

{¶ 26} Another eyewitness, Michael Shenefield, was also called by the state at trial. As the head mechanic at Auto Plus, an auto garage located across the street from

9.

the Stop & Go gas station, Shenefield was working on the morning of November 20, 2020, and witnessed the shooting. During his testimony, Shenefield indicated that he saw "an African American male that was decently tall" walk up to Volker's pickup truck, assume a "shooter's stance" and fire one round in Volker's direction. Shenefield immediately called 911 to report the shooting.

{¶ 27} While he was on the phone, Shenefield observed Volker as he "crawled out and then the African American male proceeded to beat him in the forehead with his gun which was now apparent that was a gun." Shenefield confirmed that the assailant struck Volker repeatedly, and then "walked away nonchalantly like nothing happened."

{¶ 28} Kyle Luce was a third eyewitness that testified for the state at trial. At the time of the shooting, Luce was inside the Food Mart located next to the Stop & Go gas station. He heard a gunshot and looked outside to find that people were running away from the gas station in order to find shelter. Luce saw the assailant, whom he described as a "black African American man, heavier set. I never saw his face. I could just tell it was an older person by the way they ran like their legs didn't work."

{¶ 29} On direct examination, Luce indicated that he has known Volker for over ten years. Luce testified that he was familiar with only one individual with whom Volker had an ongoing dispute, namely appellant. When asked if he was familiar with the cause of the dispute between appellant and Volker, Luce responded in the negative and stated: "Just there [were] problems."

10.

{¶ 30} At the conclusion of the state's case-in-chief, appellant's defense counsel moved for an acquittal under Crim.R. 29, which was denied by the trial court. Appellant then opted to rest without taking the stand. Thereafter, the matter proceeded to jury instructions and closing arguments. Following deliberations, the jury returned with a guilty verdict as to all charges and specifications contained in the indictment. The trial court then continued the matter for sentencing.

{¶ 31} Appellant's sentencing hearing was held on July 15, 2021. At sentencing, the trial court found that the two murder counts were allied offenses of similar import, and the state elected to proceed on the charge of murder in violation of R.C. 2929.02(B)(1). Ultimately, the trial court ordered appellant to serve 15 years to life in prison for the murder count, eight to 12 years for felonious assault, and 36 months for complicity to commit tampering with evidence. Further, the trial court imposed mandatory 3-year sentences as to each firearm specification, and ordered appellant to serve the sentences consecutively to one another.

{¶ 32} On August 13, 2021, appellant filed his timely notice of appeal.

### B. Assignments of Error

{¶ 33} On appeal, appellant assigns the following errors for our review:

Assignment of Error I: There was insufficient evidence to convict Greer of Murder, Felonious Assault or Complicity to Commit Tampering with Evidence.

11.

Assignment of Error II: Greer's act of murder and felonious assault were of similar import so they should have merged at sentencing.

## II. Analysis

{¶ 34} In appellant's first assignment of error, he argues that the evidence admitted at trial was insufficient to support his convictions.

{¶ 35} Resolving challenges to the sufficiency of the evidence requires consideration of whether, when the evidence is examined in the light most favorable to the prosecution, a rational trier of fact could have found the elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991). The appellate court must assess whether the evidence, if believed, would support a conviction. *Jenks* at paragraph two of the syllabus.

{¶ 36} Here, appellant was convicted of three distinct offenses. First, appellant was convicted of murder in violation of R.C. 2903.02(A), which provides: "No person shall purposely cause the death of another or the unlawful termination of another's pregnancy." Second, appellant was convicted of felonious assault in violation of R.C. 2903.11(A)(2), which provides that no person shall knowingly "[c]ause serious physical harm to another or to another's unborn." Finally, appellant was convicted of complicity to commit tampering with evidence in violation of R.C. 2921.12(A)(1), which provides:

12.

(A) No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall do any of the following:

(1) Alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation.

{¶ 37} In his brief to this court, appellant does not challenge the sufficiency of the state's evidence as to any of the elements contained in the foregoing statutory sections. Indeed, he does not argue that the state failed to prove that *someone* murdered Volker, committed a felonious assault against Volker, or tampered with evidence after the fact. Instead, appellant's exclusive argument under his first assignment of error is that the state "simply failed to put sufficient evidence forward placing Greer on the scene so the convictions must be reversed." Thus, appellant only raises an identity argument, insisting that he was not the individual who murdered Volker.

{¶ 38} Having reviewed the evidence we outlined in detail above in our recitation of the facts, we find that appellant's identity argument lacks merit. Even appellant acknowledges that Jensen's testimony places him on the scene of the murder at the precise time in which the shooting took place. More than that, Jensen expressly identified appellant as the shooter depicted in the surveillance video from the Stop & Go gas station. Nonetheless, appellant complains that Jensen "was not present at the gas

13.

station, did not know where Greer went after he supposedly left her car and * * * is highly suspect as she is a co-defendant." This argument is misplaced, as it attacks Jensen's *credibility*, not the sufficiency of the state's evidence. Notably, appellant does not raise an argument challenging the manifest weight of the evidence in this appeal, under which appellant's argument concerning Jensen's credibility would be more appropriate.

{¶ 39} In addition to Jensen's identification of appellant as the shooter, the state's evidence reveals the existence of appellant's DNA alongside Volker's DNA on the surgical gloves recovered by law enforcement following the shooting. Moreover, Luce testified that appellant was the only individual with whom Volker had any disputes, and appellant confirmed the existence of an ongoing feud with Volker during his interview with detective Marchyok.

{¶ 40} In sum, the state introduced ample evidence at trial in this case to enable a rational trier of fact, when examining such evidence in the light most favorable to the prosecution, to find beyond a reasonable doubt that appellant was the assailant who shot and brutally beat Volker. Accordingly, we find appellant's first assignment of error not well-taken.

{¶ 41} In his second assignment of error, appellant contends that murder and felonious assault are allied offenses of similar import in this case and thus the trial court erred in failing to merge the offenses at sentencing.

14.

{¶ 42} Whether offenses are allied offenses of similar import is a question of law that this court reviews de novo. *State v. Roberson*, 2018-Ohio-1955, 113 N.E.3d 204, ¶ 12 (6th Dist.).

{¶ 43} Ohio's multiple-count statute, R.C. 2941.25, provides:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 44} In *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, the Ohio Supreme Court set forth the following three-part test to determine whether a defendant can be convicted of multiple offenses:

As a practical matter, when determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must ask three questions when defendant's conduct supports multiple offenses: (1) Were the offenses dissimilar in import or significance? (2) Were they

15.

committed separately? and (3) Were they committed with separate animus or motivation? An affirmative answer to any of the above will permit separate convictions. The conduct, the animus, and the import must all be considered.

*Id.* at ¶ 31.

{¶ 45} We review de novo a trial court's ruling as to whether convictions merge under the allied-offenses doctrine. *State v. Corker*, 10th Dist. Franklin No. 13AP-264, 2013-Ohio-5446, ¶ 28, citing *State v. Roush*, 10th Dist. Franklin No. 12AP-201, 2013-Ohio-3162, ¶ 47.

{¶ 46} Here, appellant argues that murder and felonious assault were committed with "one continuous flow of conduct" including shooting Volker and beating Volker "seconds later." Appellant insists that such little time passed between the shooting and the beating that "it is obvious Greer had a single state of mind."

{¶ 47} In response, the state contends that merger is inappropriate here because (1) the offenses were dissimilar in import or significance because the harm attributable to the gunshot wound was separate and identifiable to the harm attributable to the beating, and (2) the offenses were committed separately with a separate animus given the break in the temporal continuum between the shooting and the beating.

{¶ 48} Having carefully reviewed the record in its entirety, we agree with the state's first argument that the harm caused when appellant shot Volker was separate and

16.

identified to the harm caused when Volker beat Volker after he fell to the ground outside of his truck. Indeed, Dr. Blomquist testified that the gunshot wound to Volker's left arm caused extensive internal damage after entering Volker's body. By contrast, Volker suffered multiple fractures to his face and neck as a result of the blunt force trauma caused by appellant's subsequent assault. Dr. Blomquist thus distinguished between the injuries Volker suffered as a result of the gunshot, which proved to be fatal, and those he suffered as a result of the assault.

{¶ 49} In considering whether the convictions were of dissimilar import under the first prong of the *Ruff* analysis, we must determine whether the two offenses involved separate victims or "separate and identifiable" harm. *Ruff* at ¶ 23. Given the distinct injuries Volker suffered in this case, we find that the harm caused by the offenses of murder and felonious assault was separate and identifiable, and thus the offenses were committed with a dissimilar import. Consequently, we conclude that the offenses of murder and felonious assault are not allied offenses of similar import in this case, and the trial court did not err in failing to merge them at sentencing.

{¶ 50} Accordingly, appellant's second assignment of error is not well-taken.

17.

### III.    Conclusion

**{¶ 51}** In light of the foregoing, the judgment of the Lucas County Court of Common Pleas is affirmed.  Costs of this appeal are assessed to appellant under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.               _____
                                                                JUDGE
Thomas J. Osowik, J.

                                                     _____
Christine E. Mayle, J.                                JUDGE
CONCUR.

                                                     _____
                                                                JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.