[Cite as *State v. Scott*, **2024-Ohio-3044.**]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                      Court of Appeals No.  L-23-1141

    Appellee                                       Trial Court No.  CR0202201540

v.

Antonio Scott                                      **DECISION AND JUDGMENT**

    Appellant                                      Decided:  August 9, 2024

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

Lawrence A. Gold, for appellant.

* * * * *

**SULEK, P.J.**

{¶ 1} Appellant Antonio Scott appeals the judgment of the Lucas County Court of

Common Pleas, following a jury trial, convicting him of one count of murder and one

count of felonious assault.  For the reasons that follow, the trial court's judgment is

affirmed.

**I. Factual Background and Procedural History**

{¶ 2} On April 6, 2022, the Lucas County Grand Jury indicted Scott on one count

of murder in violation of R.C. 2903.02(A), one count of murder in violation of R.C.

2903.02(B), and one count of felonious assault in violation of R.C. 2903.11(A)(2). The charges arose from a homicide that occurred on or around February 8, 2017.[1] Scott entered a plea of not guilty and the matter proceeded to a jury trial.

{¶ 3} Testimony from the trial revealed that on the evening of February 8, 2017, a 911 call was placed by a man identifying himself as "Tone" or "Antonio," who stated that kids found a body located in a detached garage at 215 Austin in Toledo, Ohio. The person on the 911 call sounded like an adult male, not a juvenile.

{¶ 4} Police arrived on the scene shortly thereafter, but the 911 caller was not present. It had been snowing that evening, and the first officers that arrived testified that they did not observe any footprints leading to or from the detached garage. The side door to the garage was open, and just inside the door was the body of the victim D.S., a known prostitute. D.S. was a biological male, but sometimes presented as a female. An autopsy report confirmed that D.S. died of a single gunshot wound to the chest from a .25 caliber bullet and had been dead for several days before being discovered. D.S. also had bruising to the forehead and face.

{¶ 5} When discovered, D.S. was wearing a brown outer jacket made of a down material as well as an inner jacket. Defects were found in both jackets where the bullet entered. Down from the brown jacket was spread around the crime scene. In addition, D.S. was wearing a belt that was undone and tight jeans that were unbuttoned and unzipped. Under D.S.'s head was a wig.

---

[1] Scott did not request a bill of particulars.

2.

{¶ 6} The inside of the garage was littered with garbage. Near D.S.'s body was a recently used condom, condom wrapper, and packet of lubricant. DNA testing conducted on the outside of the condom near the time of the homicide revealed a profile of an unknown individual; D.S. was excluded as a source of the DNA.

{¶ 7} Toledo Police Detective Amy Herrick testified that she canvassed the neighborhood searching for witnesses or security cameras that may have captured what happened to D.S. but was unable to locate any helpful information. She also attempted to call the phone number given on the 911 call without success. The case then went cold. Periodically, Herrick would receive information from a tipline or the victim's mother regarding the homicide, but she was never able to substantiate any of the leads.

{¶ 8} Approximately three years later, in March 2020, Herrick received information that the unknown DNA profile was possibly matched to Scott. Herrick was unable to locate Scott until October 2021, when he came to the Toledo Police Safety Building to be interviewed as a witness in an unrelated matter. Herrick obtained a warrant to collect a DNA sample from Scott and she interviewed him regarding the homicide. Scott, who was an adult at the time of the interview but who was only 15 years old when the homicide occurred, stated that in 2017 he lived at 425 Austin, two blocks from the crime scene. Scott admitted that he was often in the alley behind Austin and that he would sometimes have sex with his high school girlfriend in an abandoned house nearby. He told Herrick that he always used a condom with his girlfriend, but his girlfriend testified that they only used protection sometimes. He, however, denied ever

3.

having sex in a detached garage, denied ever having sex with a prostitute, and denied ever having sex with someone he thought was a female but who he later learned was a male. In all, he denied having any involvement with the homicide.

{¶ 9} Following the police interview, Herrick reached out to the Ohio Bureau of Criminal Investigation ("BCI") to request additional testing on the condom. Y-STR DNA testing on the inside of the condom revealed two profiles from which both Scott and D.S. could not be excluded, respectively. The probability of other males having the same profile as those linked to Scott and D.S. was less than 1 in 4,000. Additionally, BCI confirmed that Scott was the source of the DNA on the outside of the condom. BCI Forensic Scientist Logan Schepler testified that the "outside" and "inside" of the condom were described based on how the condom was presented to him for testing, not necessarily how the condom was worn.

{¶ 10} Following this, Scott was indicted and arrested in April 2022. He remained in custody pending his trial. While incarcerated, Scott encountered B.L. B.L. knew Scott from the neighborhood and stated that Scott used to mow lawns for him. The two began talking and B.L. testified that Scott confessed to details of the crime. According to B.L., Scott said that "he had got caught on a cold case because he had had a sexual relationship with a person and one thing got – they got into a fist fight or something over the money or whatever, right, and he shot the guy. He hit him in the head a couple of times with the gun. The dude was fighting back trying to pull his pants up and the gun went off and he shot the guy." B.L. testified that Scott said he paid money for the sexual encounter, but

4.

upon discovering that D.S. was a man, he wanted his money back which led to the altercation. Scott told B.L. that he used a Colt .25 and that when he shot D.S. feathers flew out of the jacket. B.L. also testified that Scott told him that he made a 911 call and identified himself as "Tone."

{¶ 11} B.L. testified that he was currently serving time in prison for violation of federal probation and has also had convictions for breaking and entering, receiving stolen property, grand theft of a motor vehicle, and theft. He stated, however, that he did not receive anything in exchange for his testimony and that he had already been sentenced on his probation violation before he came forward with his information about Scott. He testified that he did not want to testify and that he feared for his safety, but he was compelled to testify because he was subpoenaed. B.L. explained that he originally did not tell anyone what Scott confessed to him, but he felt he had to because he has a child who was born a female and now identifies as a male.

{¶ 12} On cross-examination, B.L. agreed that sometimes inmates will see another prisoner's discovery file and then use that information to claim that the other person confessed, but B.L. denied doing that in this case. He also acknowledged that he has used several aliases in his life with some police referring to him as "Lying Brian."

{¶ 13} Following the state's presentation of the evidence, Scott moved for an acquittal under Crim.R. 29, which the trial court denied. Scott then rested without calling any witnesses.

5.

{¶ 14} The matter was submitted to the jury, which returned with a verdict of not guilty on the count of murder in violation of R.C. 2903.02(A), and guilty on the counts of murder in violation of R.C. 2903.02(B) and felonious assault in violation of R.C. 2903.11(A)(2).

{¶ 15} The trial court held sentencing immediately thereafter. Scott argued that the count of murder should merge with the count of felonious assault. Scott was found guilty of murder in violation of R.C. 2903.02(B), which provides that "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offence of violence that is a felony of the first or second degree and that is not a violation of R.C. 2903.03 or 2903.04 of the Revised Code." Here, the indictment specified that the predicate offense for the murder was felonious assault in violation of R.C. 2903.11(A)(2).

{¶ 16} Scott argued that because the predicate offense for the count of murder was the same offense as the count of felonious assault, the two should merge. The state, on the other hand, argued that the predicate offense for murder was Scott's commission of felonious assault by firing the gunshot into D.S.'s chest, whereas the count of felonious assault was related to Scott striking D.S. in the face with the firearm. The trial court agreed with the state and held that the two offenses did not merge.

{¶ 17} The court then sentenced Scott to an indefinite term of 15 years to life in prison on the count of murder, a consecutive mandatory term of three years in prison for

6.

an attendant firearm specification, and a concurrent indefinite term of four to six years in prison on the count of felonious assault.

## II. Assignments of Error

{¶ 18} Scott has timely appealed his judgment of conviction and asserts four assignments of error for review:

> 1. The trial court erred to the prejudice of appellant by finding that appellant's murder and felonious assault convictions were not subject to merger.
>
> 2. The trial court erred in denying appellant's Crim.R. 29 motion.
>
> 3. The jury's verdict was against the manifest weight of the evidence presented at trial.
>
> 4. The trial court's written judgment entry does not comport with the court's sentence regarding the imposition of costs.

For ease of discussion, Scott's assignments of error will be addressed out of order, beginning with his second and third assignments of error.

## III. Analysis

### A. Sufficiency of the Evidence

{¶ 19} In his second assignment of error, Scott argues that the trial court erred when it denied his Crim.R. 29 motion for acquittal. "The denial of a motion for acquittal under Crim.R. 29(A) 'is governed by the same standard as the one for determining whether a verdict is supported by sufficient evidence.'" *State v. Haynes*, 2020-Ohio-

7.

1049, ¶ 24 (6th Dist.), quoting *State v. Tenace*, 2006-Ohio-2417, ¶ 37. In reviewing the sufficiency of the evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus; *State v. Sproles*, 2023-Ohio-3403, ¶ 33 (6th Dist.).

{¶ 20} Scott argues that the evidence was insufficient to prove his identity as the person who shot and killed D.S.; he does not contest that the evidence was insufficient to prove the elements of murder or felonious assault. Specifically, he argues that there was no eyewitness evidence, no forensic evidence linking him to D.S.'s head injury or to the gun that was used to kill D.S., and no testimony explaining how the condom came to be found in the garage or how his DNA got on the condom.

{¶ 21} Upon review of the evidence in the light most favorable to the prosecution, the evidence is sufficient to support Scott's convictions. Scott lived approximately two blocks from the crime scene and admitted to frequenting that alley. His DNA was found on the outside of a used condom near D.S.'s body and DNA consistent with both of them was also found on the inside of that same condom. Scott confessed to B.L. that he engaged in sexual activity with D.S. and upon learning that D.S. was a male entered into an argument that led to a physical altercation and him shooting and killing D.S. From this evidence, a rational juror could have found beyond a reasonable doubt that Scott was the person who assaulted and murdered D.S.

8.

**{¶ 22}** Accordingly, Scott's convictions are not based on insufficient evidence and his second assignment of error is not well-taken.

### B. Manifest Weight

**{¶ 23}** In his third assignment of error, Scott argues that his convictions are against the manifest weight of the evidence. "Insufficiency and manifest weight are distinct legal theories." *State v. Petitto*, 2024-Ohio-186, ¶ 30 (6th Dist.), quoting *State v. Fenderson*, 2022-Ohio-1973, ¶ 73 (6th Dist.). When reviewing a manifest weight claim, "[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Lang*, 2011-Ohio-4215, ¶ 220, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). "The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Id.*, quoting *Thompkins* at 387.

**{¶ 24}** Scott contends that the jury did not fully consider and properly weigh all the evidence in four ways. First, he cites the lack of any forensic evidence tying him to the firearm that was used to beat and shoot D.S. Second, he notes that the state's key witness, B.L., is a lying, convicted felon who is not to be trusted. Third, he suggests that numerous people may have had motive to harm D.S., pointing to trial testimony that D.S. was known to "out" clients who did not want their sexual preferences made public and

9.

that D.S. had been indicted for robbery two months prior to being shot. Finally, he argues that because the door to the garage was open, anyone could have entered and deposited evidence or disturbed the scene before the police arrived.

{¶ 25} Upon review of the entire record, this is not the exceptional case in which the jury clearly lost its way and the evidence weighs heavily against the conviction. As discussed above, Scott's and D.S.'s DNA were on the used condom found by D.S.'s body. Despite this, Scott denied ever having a sexual relationship with D.S. or with a prostitute yet offered no alternative explanation for how his DNA came to be present. Even more significantly, B.L. testified that Scott confessed to killing D.S., and although B.L. has a criminal history of crimes of theft or deception and a reputation for dishonesty, it is noteworthy that he did not receive any benefit or consideration for his testimony in the form of privileges or a reduction in prison time. Further, B.L. knew Scott from before being in prison, making it more likely that Scott would confide in him. Therefore, because Scott's DNA was at the crime scene and because there was believable testimony that Scott confessed to killing D.S., his convictions are not against the manifest weight of the evidence.

{¶ 26} Accordingly, Scott's third assignment of error is not well-taken.

### C. Merger

{¶ 27} Scott argues in his first assignment of error that the trial court erred in failing to merge his convictions of murder and felonious assault.

10.

**{¶ 28}** "R.C. 2941.25 codifies the protections of the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and Section 10, Article 1 of the Ohio Constitution, which prohibit multiple punishments for the same offense." *State v. Rogers*, 2022-Ohio-4126, ¶ 16 (6th Dist.). That section provides,

> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

> (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

R.C. 2941.25.

**{¶ 29}** The test for determining whether allied offenses should be merged is well-established:

> As a practical matter, when determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must ask three questions when defendant's conduct supports multiple offenses: (1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with separate animus

or motivation? An affirmative answer to any of the above will permit separate convictions. The conduct, the animus, and the import must all be considered.

*State v. Bailey*, 2022-Ohio-4407, ¶ 10, quoting *State v. Earley*, 2015-Ohio-4615, ¶ 12, quoting *State v. Ruff*, 2015-Ohio-995, ¶ 31. "[T]wo or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Ruff* at ¶ 23.

{¶ 30} "The defendant bears the burden of establishing his entitlement to the protection, provided by R.C. 2941.25, against multiple punishments for a single criminal act." *State v. Washington*, 2013-Ohio-4982, ¶ 18, quoting *State v. Mughni*, 33 Ohio St.3d 65, 67 (1987); *State v. Smith*, 2023-Ohio-866, ¶ 10 (6th Dist.). "An appellate court reviews de novo whether offenses should be merged as allied offenses under R.C. 2941.25. *Smith* at ¶ 10, citing *Bailey* at ¶ 6.

{¶ 31} Scott argues that the State's theory for the conduct supporting the felonious assault charge in count three was Scott's shooting of D.S. Because this conduct is the same as the conduct forming the predicate offense for murder under R.C. 2903.02(B) in count two, he contends that the two offenses must merge. The State, on the other hand, argues that the count of felonious assault is supported by Scott's conduct of hitting D.S. in the face with the gun, whereas the predicate offense for the count of murder was Scott's conduct of shooting D.S. Scott counters that this was not the State's theory

12.

throughout the pendency of the case and only arose during B.L.'s testimony at trial. Notably, Scott does not argue that the harms caused by the hitting of the face and the shooting are not separate and distinct. Instead, his argument centers on the State's changing theory of the evidence supporting each count.

{¶ 32} In that way, this case presents a similar situation to that in *State v. Washington*, 2013-Ohio-4982. In *Washington*, the State pursued charges of failure to comply with the order of a police officer and obstruction of official business on a single continuous event involving a car chase that turned into a foot chase. *State v. Washington*, 2012-Ohio-2117, ¶ 17 (9th Dist.). On resentencing for application of the new merger analysis set forth in *State v. Johnson*, 2010-Ohio-6314, the trial court agreed with the State's argument that the failure to comply offense was established based on the car chase and the obstruction of official business offense was based on the foot chase, and thus the two did not constitute allied offenses of similar import. *Washington* at ¶ 5.

{¶ 33} On appeal, the Ninth District reversed, reasoning:

The State's theory at trial was that the high-speed car chase in which [the defendant] engaged formed the basis for both his failure to comply and obstructing official business charges. The trial court permitted the State to argue at the resentencing that the subsequent foot chase could support the latter charge. . . . Alternative theories that the State might have pursued, but did not, cannot form the basis for the State's argument at resentencing. Instead, the allied offense analysis must derive from the evidence

13.

introduced at trial, the record, and the legal arguments actually raised. [*State v. Johnson*, 2010-Ohio-6314,] at ¶ 56; ¶ 69-70 (O'Connor, J., concurring). At no point before resentencing for the application of *Johnson* did the State raise the argument that [the defendant's] flight from the police on foot amounted to a separate act of conduct for which Washington possessed a separate animus.

*Id.* at ¶ 16. The Ninth District, relying on *Johnson*, concluded that because the State did not differentiate between the car chase and the foot chase at trial, but relied on the entire continuous chase to prove both the failure to comply and obstructing official business charges, the two offenses were allied offenses of similar import that must merge. *Id.* at ¶ 17.

{¶ 34} The Supreme Court of Ohio reversed, reasoning that "[c]ontrary to the court of appeals' view, nothing in *Johnson* requires courts to consider only the evidence and arguments presented by the state at trial." *Id.* at ¶ 17. "Merger is a sentencing question, not an additional burden of proof shouldered by the state at trial." *Id.* at ¶ 18. The Court, therefore, held that "when deciding whether to merge multiple offenses at sentencing pursuant to R.C. 2941.25, a court must review the entire record, including arguments and information presented at the sentencing hearing, to determine whether the offenses were committed separately or with a separate animus. The court of appeals erred by looking solely to what it perceived as the state's theory of the case at trial and by refusing to consider the information presented at the sentencing hearing." *Id.* at ¶ 24.

*See also State v. Riley*, 2024-Ohio-2519, ¶ 22-23 (3d Dist.) (prosecution not strictly bound by allegations set forth in bill of particulars and the State's recitation of facts at sentencing supported the imposition of separate sentences based on separate conduct).

{¶ 35} Applied here, the trial court properly considered the State's arguments and information presented at the sentencing hearing and did not err when it found that Scott's offenses of murder and felonious assault did not merge. Scott's conviction for felonious assault was supported by evidence that he struck D.S. in the head with his gun, causing bruising to the forehead and face. The harm caused by this conduct was separate and distinct from the harm caused by Scott's act of fatally shooting D.S. in the chest. Therefore, the two offenses were not allied offenses of similar import. *See State v. Greer*, 2022-Ohio-3082, ¶ 48-49 (6th Dist.) (injuries resulting from a gunshot were separate and identifiable from injuries caused by an assault, thus the offenses of murder and felonious assault were not allied offenses of similar import).

{¶ 36} Recently, in *State v. Hair*, 2023-Ohio-2422 (6th Dist.), this court addressed a similar issue but reached a different result. In that case, Hair stabbed the victim multiple times, ultimately causing the victim's death. Among other things, Hair was charged with felony murder under R.C. 2903.02(B), with the predicate offense being felonious assault. In addition, Hair was charged with a separate count of felonious assault in violation of R.C. 2903.11(A)(1). *Hair* at ¶ 2. Hair was found guilty, and at sentencing she argued that the two offenses should merge. The State opposed merger, arguing that some of the stab wounds were not fatal and should be separated such that the

15.

murder and felonious assault were not allied offenses of similar import. *Id.* at ¶ 67. The trial court agreed with the State and declined to merge the two offenses.

{¶ 37} On appeal, this court held that the trial court's failure to merge the offenses was plain error. *Id.* at ¶ 71. This court reasoned that it was "evident from the state's closing argument and the fact that [Hair] was charged with only one count of felonious assault [that] there is no merit to the state's contention that the felonious assault conviction was based only upon the non-fatal stab wounds inflicted by [Hair]. *Id.* It determined that the state elected to charge Hair with a sole count of felonious assault based upon the stabbing as a whole and did not distinguish between the fatal and non-fatal injuries during the trial. *Id.* Instead, the state's argument in closing established that "the felony murder charge was predicated upon the entire stabbing incident, not just those blows that were fatal." *Id.* There the State had argued,

> So the next offense we'll talk about is felonious assault, and the State must prove that on or about October 19th, in Lucas County, Ohio, Anne Hair knowingly caused serious physical harm to Anthony Banks. * * * We know that Anne Hair's act, that is, repeatedly stabbing and cutting Anthony Banks, directly produced serious physical harm to Anthony Banks. Without her actions the serious physical harm would not have occurred. * * * Therefore, the State has proven all of the elements of this offense, and has proven the offense itself. So now we're going to add to it like we just did the last time, and in order to prove the elements of murder the State

16.

must prove that on or about October 19, 2020, in Lucas County, Ohio, Anne Hair caused the death of Anthony Banks as a proximate result of committing felonious assault. * * * We can rely on the evidence we just discussed when establishing felonious assault * * *. So if you agree that the State has proven felonious assault, then the State has met its burden on this last element here. And because we've checked off every element, the State has proven all of the elements of murder.

*Id.* at ¶ 68. Further, the trial court in that case "explained to the jury that the charge of murder was predicated upon the charge of felonious assault, and instructed the jury that it must find appellant guilty of felonious assault in order to consider the murder charge." *Id.* at ¶ 69. Thus, this court concluded that the offenses of felonious assault and felony murder, "as they were tried in this case," were allied offenses of similar import as a matter of law. *Id.* at ¶ 71.

{¶ 38} The present case is factually distinguishable from *Hair*. In *Hair*, the State presented to the jury only one factual basis for felonious assault and did not differentiate between fatal and non-fatal stab wounds. In contrast, the State in this case did differentiate between the two in its closing arguments:

Moving on to count two, this is another theory of murder. It doesn't mean there's two victims. It doesn't mean the State of Ohio's trying to get two bites at the same apple. It's just another theory we want you to

17.

consider because one defendant's course of conduct can violate multiple laws.

You will notice the majority of these elements are the same as the first and so I'm not going to go over them with you again, but your key distinction here is going to be Murder (B), sometimes we call this Murder (B) or (B), Murder doesn't care about purpose. It doesn't matter. The only thing that matters in B Murder is that death was caused as a result of committing a violent F1 or F2, in this case Felonious Assault.

So number (element) five, Felonious Assault, will be defined in the next count, but it's knowingly cause or attempt to cause physical harm by means of a deadly weapon. We'd submit to you when the defendant shot the victim in this case, he knowingly caused harm by a deadly weapon which is the gun.

If you find we proved each and every one of these elements, your verdicts must be guilty. It will not only have the harm for shooting the victim in this case which is the predicate offense for count two, we also have the suffering of harm from pistol whipping. You heard about the pistol whipping in this case from Brian Lee. You saw corroborating evidence in the autopsy photos and heard from Dr. Pandey that there is injury to the forehead of the victim in this case. Felonious assault, is number one, Antonio Scott; number two, on or about February 8th, 2017;

number three, in Lucas County; number four, knowingly caused or attempted to cause physical harm by means of a deadly weapon, a firearm and again you see the spec.

We submit to you we've proved all of these elements beyond a reasonable doubt and we've discussed them now in good detail in count one and two.

. . . Count two Murder or (B) Murder is that in pointing the gun at DeMajio JoJo Striker and pulling the trigger, you knew or had reasonable cause to believe that the discharge of that bullet would cause or attempt to cause physical harm. Here, it was actually serious physical harm.

There's been no contention about any of those elements of count one (murder) or count two. And I know it seems weird that the State is charging two murders for one victim, but it's kind of like the argument my mother and I got into as a child when I would be tasked with cleaning the bathroom or the kitchen and she would come in and tell me I had done it wrong. And my question to her was always, well, but it's done, right? And she said yes.

Here there's two ways the State of Ohio can prove its case because there are two different offenses that the defendant committed in murdering the victim. That's why it's charged in the alternative. And if you find the

State of Ohio has proven the elements as to both Murder, count one and Murder in count two, your verdict must be guilty as to both.

Further, there's no contention really as to the felonious assault. Again, that the victim was struck in the face with a firearm, causing or attempting to cause physical harm with a deadly weapon, the firearm, and then shot. The only question is who.

**{¶ 39}** In addition, unlike *Hair*, the jury was not instructed that it must find that the defendant committed felonious assault before it could consider whether she committed felony murder. Instead, the jury in this case was instructed to consider the offense of felony murder in count two and then consider the offense of felonious assault in count three.

**{¶ 40}** Here, the State provided the jury an alternative factual basis for the offense of felonious assault that was different from the factual basis supporting the predicate offense for felony murder. The trial court then instructed the jury to give separate consideration to the offenses of felony murder and felonious assault. At sentencing, the State argued that the count of felonious assault was supported by Scott's act of hitting D.S. in the face with the pistol and the predicate offense for felony murder was supported by Scott's act of shooting D.S. in the chest. It may have been that the jury only found Scott guilty of felonious assault based on his act of shooting D.S., but it is impossible to know. It, however, is not the State's burden to prove that the offenses do not merge; it is Scott's burden to prove that they do. Scott has failed to meet that burden. Therefore, the

20.

trial court did not err when it did not merge the offenses of felony murder and felonious assault.

{¶ 41} Accordingly, Scott's first assignment of error is not well-taken.

### D. Costs of Prosecution

{¶ 42} Finally, in his fourth assignment of error, Scott argues that the trial court's judgment entry of conviction is not consistent with the sentence imposed at the sentencing hearing on the issue of costs. Scott's argument is factually incorrect.

{¶ 43} At the sentencing hearing, the trial court stated, "You're ordered to pay the costs of prosecution but I'll waive any other charges in light of your sentence and the fact that you really won't have the ability to pay these amounts." In the judgment entry of conviction, the trial court stated, "Defendant ordered to reimburse the State of Ohio and Lucas County for the costs of prosecution as authorized by law." Thus, the judgment entry is consistent with the trial court's announced sentence.

{¶ 44} Furthermore, the costs of prosecution are mandatory. "R.C. 2947.23 requires the trial court to impose the costs of prosecution in all criminal cases against all convicted defendants regardless of their financial status, and no hearing is required before ordering the payment of those costs." *State v. Gilmer*, 2024-Ohio-1178, ¶ 102 (6th Dist.), citing *State v. Nettles*, 2018-Ohio-4540, ¶ 31 (6th Dist.). Notably though, Scott may yet seek to have the costs waived because "R.C. 2947.23(C) vests the trial court with continuing jurisdiction to waive, suspend, or modify the payment of the costs of prosecution, at the time of sentencing or any time thereafter." *Id.*

21.

**{¶ 45}** Nonetheless, based upon the record, the trial court did not err in its imposition of the costs of prosecution. Accordingly, Scott's fourth assignment of error is not well-taken.

### IV. Conclusion

**{¶ 46}** For the foregoing reasons, the judgment of the Lucas County Court of Common Pleas is affirmed. Scott is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Gene A. Zmuda, J.             _____
                                                 JUDGE

Myron C. Duhart, J.          

                                                 _____
Charles E. Sulek, P.J.                                     JUDGE
CONCUR.

                                                 _____
                                                 JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.